**BROWN DALTAS AND ASSOCIATES INC., Benjamin I. Brown, Spero Daltas, and Brown Daltas and Associates Saudi Arabia Ltd., Plaintiffs,**

v.

**GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, and Northbrook Excess and Surplus Insurance Company, Defendants.**

Civ. No. 91–10010–K.

United States District Court, D. Massachusetts.

Feb. 15, 1994.

---

William Shields, Day, Berry & Howard, Boston, MA, for plaintiffs.

David J. Hatem, Burns & Levinson, Boston, MA, Jon C. Cowen, Sibley P. Reppert, Daniel F. Featherston, Jr., Posternak, Blankstein & Lund, Boston, MA, for defendants.

## ORDER AND MEMORANDUM OF OPINION

BRODY, District Judge.

### I. FACTS

Brown Daltas and Associates ("BDA"), an architectural firm, entered into a contract with the Saudi Arabian Monetary Authority ("SAMA") in April 1974.[1] Under this contract, BDA planned and designed branch banks for the SAMA in Jedda, Riyadh, Damman, Mecca, and Medina over a period of approximately four years.

In 1978, BDA entered into a joint venture with Xenel, a Saudi Arabian Company.[2] In the same year, the SAMA entered a supervision contract with Brown Daltas and Associates Saudi Arabia Ltd. ("BDASA"). Under

---

1. BDA operated as a partnership when it signed the design contract with the SAMA. In 1976, the partners of BDA formed a Massachusetts corporation called Brown Daltas and Associates, Inc. The Court refers to both the partnership and the corporation as "BDA."

2. Xenel owned 25% of the joint venture. The remaining 75% was owned by Brown Daltas & Associates Ltd., a British company.

the supervision contract, BDASA administered and supervised the construction contracts for the branch banks. BDASA and the SAMA signed another supervision contract in 1983.

## A. Insurance Coverage

### 1. Supervision coverage

BDASA carried consecutive, annual, consulting engineer's indemnity policies issued by underwriters at Lloyd's, London from January 1979 through February 1986.

### 2. Design coverage

BDA carried professional liability insurance issued by underwriters at Lloyd's, London until April 1979. The 1978–79 Lloyd's policy named both BDA and BDASA as insureds. The policy listed the SAMA branch banks as the largest percentage of BDA's total work, but excluded the "Saudian [sic] Arabian Joint Venture". It therefore covered BDA's SAMA design work, and excluded the supervision work by the joint venture, BDASA.

In May 1979, BDA transferred its professional liability insurance to one of the Defendants, the Northbrook Excess and Surplus Insurance Company ("Northbrook"). The underwriting manager for Northbrook was Shand, Morahan & Company ("Shand"). The Northbrook policies required BDA to report claims to Shand.

Northbrook issued BDA claims-made professional liability policies. The policies defined claims-made insurance as follows:

**Coverage: Claims Made Provision.** The Company will pay on behalf of the Insured all sums in excess of the deductible amount stated in the Declarations which the Insured shall become legally obligated to pay as damages by reason of any act, error or omission committed or alleged to have been committed by the Insured, or any person or organization for whom the Insured is legally liable provided always that:

(a) Claim is first made against the Insured during the policy period by reason of such act, error or omission, and

(b) The Insured's legal liability arises out of the performance of professional services as described in the Declarations, and

(c) The Insured has no knowledge of such act, error or omission on the effective date of this Policy.

The policies contained a discovery clause:

**Discovery Clause.** If during the policy period the Insured shall first become aware of any circumstances which may subsequently give rise to a claim against the Insured by reasons of any act, error or omission for which coverage would be afforded hereunder and if the Insured shall during the policy period herein give written notice to the Company of such circumstances, any claim which may subsequently be made against the Insured arising out of such act, error or omission shall be deemed for the purpose of this Policy to have been made during the policy period stated in the declarations.

All Northbrook policies covered both BDA and BDASA. The first Northbrook policy provided that it was a renewal of BDA's Lloyd's policy. The policy stated that "[a]ll work as construction managers is currently separately insured with Lloyd's of London."

The second Northbrook policy was a renewal of the first, and it ran from May 1980 to 1981. The policy did not contain language indicating that construction supervision was separately insured elsewhere. However, question 20 of the application asked whether any one contract or client represented more than 50% of annual work. BDA's answer stated: "At present two projects insured separately represents [sic] 83% of BDA's work." One of these projects was BDASA's supervision work for the SAMA.

The third Northbrook policy, number 63133836, was a renewal of the second, and ran from May 1981 to June 1982. Question 16 in the application for this policy requested fees and construction values spanning from 1979 to 1982. BDA supplied the information, and noted " * SAMA" next to some of the numbers listed under "Gross billings/Fees." At the bottom of the chart a legend read " * Separately insured elsewhere." The noted fees were those that BDASA was billing

SAMA. The policy also contained a construction management endorsement that excluded claims due to faulty supervision work.

Between June and August of 1982, BDA consented to a change in insurance carrier, and the Evanston Insurance Company provided coverage. Shand continued as underwriting manager.

Shand transferred BDA's professional liability policy to the General Accident Insurance Company of America ("General Accident") in August 1982. All of the General Accident policies insured BDA and BDASA, and included the same claims-made provision and discovery clause as the Northbrook policies. *See supra* at 2–3.

■ The first General Accident policy ran through September 1983. The policy contained a joint venture endorsement that provided coverage under the policy for BDA's involvement in joint ventures. Addition of the joint venture endorsement necessitated an exclusion of coverage for specific operation ("specific operation exclusion"). The exclusion states:

> there is not coverage hereunder for any work performed by the Named Insured for the following project or firm: KKMC, Joint Venture, SAMA, Joint Venture & MOH, Joint Venture.

The language before the colon was Shand boilerplate, and Richard Shapleigh, BDA's comptroller, drafted the language that excluded the three joint ventures. The Court reads the specific operation exclusion to exclude BDASA's supervision work for the SAMA. This conclusion is buttressed by BDA's answer to question 16 in the policy application. It listed fees and collection values from 1980 through 1983. An asterisk followed certain numbers on the list. A legend at the bottom of the page read: "SAMA Supr. insured elsewhere". This legend indicated that the SAMA supervision work performed by BDASA was not covered by this policy. The obvious inference is that the other work that BDA did for the SAMA was covered by the policy.

The second General Accident policy, number PE11970, ran from 1983–84 and was in all relevant respects identical to the preceding policy.

The 1984–85 General Accident policy, number PE15181, contained a page with the specific operation exclusion, and a clarification of the exclusion that Comptroller Shapleigh drafted. In addition to the language quoted above, the exclusion states:

> For clarification purposes, the Joint Ventures named above are more specifically identified as ... Brown Daltas and Associates Saudi Arabia LTD [BDASA] ... prime contractor for the Saudi Arabian Monetary Agency [SAMA]—Branch Bank Building Program (Construction Supervision).

BDA's answer to question 16 in the application to PE15181 stated more clearly that BDASA, or the SAMA supervision work, was separately insured elsewhere. The legend read: "SAMA ... Supervision–Insured Elsewhere."

Spurred to action by its apparent confusion about coverage for the SAMA project, Shand finally requested the Lloyd's policies covering BDASA's supervision work for the SAMA in August 1985. In October 1985, Shand filed a declaratory judgment action in this Court, seeking a declaration that their policies did not cover any of BDA's work for the SAMA. This action was later dismissed without prejudice. Soon after filing the declaratory judgment action, General Accident terminated BDA's insurance policy.

## B. The Project

BDA completed the design phase of the branch banks in 1978. Laing, Wimpey, Alireza ("LWA") bid on the contracts at Riyadh, Damman, and Jeddah. Construction of the branch banks in Riyadh and Damman began in late 1978.

### 1. HVAC system

LWA informed BDA of a potential problem with mechanical services in the Riyadh branch in late 1981.[3] In an October 1981

---

**3.** Defendants maintain that LWA noticed this problem to BDASA in 1979. They cite a July 19,

1981 letter from LWA to BDASA that states:

meeting, LWA charged that the heating, ventilation and air conditioning ("HVAC") system was defectively designed. BDA advised Shand of the possibility of a claim on November 25th, and Shand opened a claims file. Shand requested additional information about the claim that BDA provided in June 1982. BDA stated that the design of both the Riyadh and the Damman branch was identical, and that BDA was attempting to establish that the cause of the problem was something other than faulty design. Shand sent BDA a letter in December 1982 stating that BDA had provided no further information, and that the claims file was being placed on inactive status, but could be reopened if the incident resulted in a claim. In August 1982, John Rothkopf, a claims handler at Shand, stated that the liability of underwriters "appears to be that of the insured," meaning that if a claim were made, he saw no grounds to disclaim coverage.

The construction subcontractor redesigned and installed a HVAC system different than the one that BDA designed. This system failed. Eventually a specialist engineer, Chris Burgess, advised LWA to rebuild the Damman and Riyadh air conditioning systems to conform them to the original BDA design. LWA made an effort to conform the system to the original BDA design by 1985.

In June 1985, BDA sent Shand a letter enclosing a telex from John Thornley, a BDA designer in Saudi Arabia. Thornley reported the replacement of the HVAC system "in almost the precise configuration of our initial design." Thornley warned, however, that the system had not been tested, and requested BDA to "keep the present status." Thornley's hesitation to report success with the HVAC system stemmed from the appearance of an electrical problem that had prevented complete testing of the HVAC system.

On June 21, 1986, BDA informed Shand that the maintenance contractor at Damman blamed BDA for problems with air conditioning compressors. BDA included a telex from the SAMA stating that the HVAC installer had reported that the HVAC systems were of "incorrect design" and that "an inherent compressor failure mode [was] present." BDA referred to the letter of notification dated November 25, 1981.

2. Electrical system

In BDA's original design of the branch banks, all electrical transformers were located in the banks. The power companies in Riyadh, Damman, and Jedda later refused to supply electricity in the voltage that the design required. Therefore, after BDA completed the design, but before contractors bid on the contract, BDA was forced to modify the design and move the electrical transformers out of the building. BDA connected the transformers to the building with low voltage cables. The added expense of these changes was reflected in a bulletin that BDA issued less than two weeks before the bid date. These added charges were called "unauthorized extras."[4]

BDA notified General Accident generally of the problem of "unauthorized extras" in a supplement to the application for PE15181. The supplement is dated September 19, 1984 and states:

> SAMA has indicated that if any unauthorized change orders resulting in increase in price can be attributable to design (and not supervision), these may be backcharged to BDA Inc. This item has already been filed with Carrier.

When LWA turned on the power to test the air conditioning system, some of the underground cables overheated. On June 26, 1985, the SAMA informed BDA that the electrical cables supplying the Riyadh branch were overloaded, needed to be replaced, and that BDA would be responsible for the cost of new cables. BDA notified Shand by letter

---

This company has no design obligations. The error within your specification was pointed out in 1979 and at no time were revised on/off coil conditions placed with us. We would confirm your designers own words at the recent meetings where he stated that a "mistake was made."

This letter reference alone is insufficient to prove that BDA or BDASA had notice in 1979.

4. These charges were classified as "unauthorized" because they. had not been approved by the SAMA through formal change orders.

of this possible claim the next day, but it was missent. BDA subsequently notified Shand by telephone and by letter dated July 18, 1985. BDA sent a letter to Shand on August 5, 1985 notifying them that the SAMA ordered electrical cable repairs.

In response to the electrical problem, BDA retained an electrical consultant, who generated a technical report. BDA sent this report to Shand and to the SAMA. In August 1985, the SAMA told BDA to instruct LWA to correct the cables, and told BDA that they would assess costs later. BDA notified Shand of the corrections.

### C. Settlement

In June 1984, BDA presented the SAMA with the final technical and financial reports of the Jeddah and Dammam branches. The reports show both fees (monthly payments on design work) and claims (extra costs that arose during design) that the SAMA owed BDA.

In November 1986, BDA and BDASA completed the design and supervision services, and requested financial resolution meetings with the SAMA. BDA issued a comprehensive and well documented report of unpaid fees and claims. BDA and BDASA requested SR. 4,147,640 in outstanding fees and SR. 9,044,697 in outstanding claims, for a total of SR. 13,192,337.[5] Comptroller Shapleigh revised these figures in 1988 after SAMA paid some fees, leaving a balance of SR. 3,969,640 in outstanding fees.

BDA's financial report prompted a letter from the SAMA dated April 7, 1987 (the "9215 letter"). This letter stated the SAMA's intention to make claims against BDA. The SAMA proposed a SR. 9,000,000 claim for negligence in the design of the electrical system; a SR. 4,139,249 claim for poor design of the HVAC system; and a SR. 1,742,229 claim for errors on the "bills of quantity;" for a total of SR. 14,881,478. The 9215 letter also served as a vehicle for making a settlement offer. The final page of the letter stated that the SAMA was prepared "to renounce all claims against BDA in return for a zero settlement of your final ac-

count." The Court is satisfied that the 9215 letter reflects an accurate and fair allocation between design and supervision claims.

After BDA received the 9215 letter, it notified its lawyer, Joseph Hinkle, and Shand. Hinkle in turn spoke with David Hatem, the lawyer retained by Shand. BDA and the SAMA began settlement discussions. BDA requested that the insurers participate, but the Defendants declined. Richard Hougham, BDASA's quantities surveyor, analyzed the SAMA's claims in preparation for the negotiations with the hope of reaching a global settlement with the SAMA and the insurers. His report was completed by May 1987. Hinkle kept the insurers informed of the negotiations throughout the process.

A May 15, 1987 record of some of the settlement negotiations indicated that the SAMA recommended an "alternative insurance recovery and enquired how SAMA could help." The SAMA required that BDA be covered by insurance as a condition to granting the branch bank design contract. It therefore follows that the settlement negotiations included discussion of BDA's insurance coverage.

BDA responded in writing to the 9215 letter in March 1988, stating that they could not afford to participate in a zero-sum settlement. The response led to further negotiations, and a written record of the negotiations prepared by the SAMA dated June 12, 1988 (the "13202 letter"). The 13202 letter referred to additional claims that the SAMA planned to bring against BDA, and explained that the SAMA would not pay BDA anything because of the SAMA's outstanding claims against BDA. The letter also reflected BDA's negotiating position, that the deficiencies were not design faults.

The SAMA did not sue BDA, nor did the parties enter a formal U.S.-style grievance procedure or arbitration.

After receiving the 9215 and the 13202 letters, BDA repeatedly requested that the SAMA define what were referred to as additional claims. There is absolutely no evidence in the record to support Defendants' allegation that BDA and the SAMA colluded

---

**5.** The applicable exchange rate is SR. 3.75 per $1.

so that BDA could get extra money from its insurers.

On June 28, 1988, Shand's counsel, Hatem, wrote BDA's counsel, Hinkle. The Hatem–Hinkle letter states:

I recommend that BDA fulfill its obligation to mitigate any damages by consummating a settlement with SAMA pursuant to which SAMA agrees to release and waive any of its claims against BDA. I understand that this type of settlement arrangement has been available to BDA since at least as early as July 1987 and presently remains available to BDA. As I previously advised, *BDA has the authority and consent of Northbrook, Evanston, General Accident and Shand to consummate a settlement* along those lines *without prejudice to any coverage defenses* that those companies may have. (Emphasis added.)

This letter unambiguously provides BDA authority and consent to settle its claims with the SAMA, subject only to the insurers' coverage defenses. BDA relied on this authority and consent while negotiating the final settlement.

BDA and the SAMA entered a zero-sum settlement agreement on February 16, 1990. BDA filed this action against Defendants alleging breach of contract and unfair trade practices on January 3, 1991.

## II. BREACH OF CONTRACT

Each Plaintiff is a named insured on claims-made professional liability policies that Defendants issued. The insurance contracts are valid and enforceable, and Plaintiffs paid all premiums. Plaintiffs allege that

Northbrook and General Accident breached these contracts when they refused BDA payment, causing damage to BDA.

■ Plaintiffs have standing to sue Defendants under the terms of the contract. Condition V in the policies provides that BDA cannot sue the Insurers "to recover for any loss under this Policy ... until the amount of such loss shall have been fixed or rendered certain ... by agreement between the parties with the written consent of the Company." The Hatem–Hinkle letter provided the necessary written consent to satisfy condition V.[6]

### A. Duty to Defend

■ Section V(a) in the Insuring Agreements section of the policies states:

The Company shall defend any *suit* against the Insured seeking damages to which this Policy applies ... and it is agreed that the Company *may* make such investigation and settlement of any *claim* or suit as they deem expedient. (Emphasis added.)

The SAMA never sued BDA, and under the terms of the policies, Defendants were only required to defend against a "suit."[7] Defendants did not have, and therefore could not breach, a duty to defend Plaintiffs.[8]

### B. Duty to Indemnify

■ The Hatem–Hinkle letter does more than give Plaintiffs standing to sue under the contract. It requires Defendants to indemnify BDA subject only to "coverage defenses."

---

**6.** Defendant argues that without written authority to settle that Plaintiffs could not seek recovery, and cites *Augat, Inc. v. Liberty Mut. Ins. Co.,* 410 Mass. 117, 571 N.E.2d 357 (1991). *Augat* is inapplicable. It holds that an insurer has no duty to indemnify when the insured enters a settlement agreement without prior consent *and* the policy in question has a voluntary payment exclusion.

**7.** An insured may argue that certain government-agency action triggers a duty to defend because it is the functional equivalent of a suit. *Hazen Paper Co. v. U.S. Fidelity and Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576, 581 (1990). The 9215 letter from the SAMA was not, however, the functional equivalent of a suit.

**8.** If this were a straightforward duty to defend case, case law is clear. An insurer who improperly declines to defend a claim is not automatically liable for the amount of any settlement reached. *Polaroid Corp. v. The Travelers Indem. Co.,* 414 Mass. 747, 610 N.E.2d 912, 920 (1993); *Berke Moore Co. v. Lumbermans Mut. Casualty Co.,* 345 Mass. 66, 185 N.E.2d 637, 639 (1962). An insurer who wrongfully declines to defend a claim has the burden of proving that the claims were *not* within its policy coverage. *Polaroid,* 610 N.E.2d at 922. If the insurer fails to meet this burden, it is liable for a reasonable settlement. *Berke Moore,* 185 N.E.2d at 641.

■ Generally an insurer's duty to defend is more broad than its duty to indemnify. *Boston Symphony Orchestra v. Commercial Union Ins. Co.*, 406 Mass. 7, 545 N.E.2d 1156, 1158 (1989). It is generally accepted that the duty to defend is antecedent to the duty to indemnify. *Id.; Ryan v. Royal Ins. Co.*, 916 F.2d 731, 743 (1st Cir.1990) (applying New York law). However, the Court has found no authority to support the allegation that because a claim fails to trigger a duty to defend, that an insurer who expressly and unambiguously consents to a settlement is not liable for the settled claims. In effect, the Hatem–Hinkle letter triggered the duty to indemnify under the policies, and created a distinct indemnification contract.

## C. Coverage Defenses

■ Defendants must indemnify BDA for the SAMA claims that are not subject to valid coverage defenses. "Coverage defense" is not defined in the policy. The Court construes the term broadly to include any defense that Defendants can raise to argue that the claim does not fall under the policy. Defendants raise four coverage defenses: the withdrawal of fees provision; inadequate notice of the electrical claim; inadequate notice of the HVAC claim; and the specific operations exclusion. The Court finds for the Plaintiffs on three of the defenses, and for the Defendants on inadequate notice of the electrical claim.

### 1. Withdrawal of fees

■ The policies exclude from their definition of damages "the return or withdrawal of fees." Defendants argue that a zero-sum settlement is a withdrawal of fees because under such an arrangement an insured drops its request for payment of fees in exchange for the claimant dropping its claims. Defen-

dants may not avoid paying BDA on this basis.

The withdrawal of fees exclusion exists to prevent an insured and a claimant from colluding and obtaining an unwarranted insurance recovery. No evidence of collusion exists in this case. Further, Defendants' argument rests in formality and not logic. Defendants argue that no money changed hands in the zero-sum settlement, and therefore a withdrawal of fees occurred. However, the zero-sum settlement functions as if each paid the other.

### 2. Inadequate notice of the electrical claim

■ Defendant General Accident argues that BDA's notice of the electrical claim on September 19, 1984 in question 30 of the application for policy number PE15181 was insufficient.[9] The Court agrees, and denies Plaintiffs' recovery on the electrical claim.

This notice does not bring the electrical claim under the 1984–85 policy. The Advisory Endorsement to that policy states that no coverage exists under policy number PE15181 for any claim "referred to in answer to question 30 in the application." BDA must therefore establish that the notice in the application to PE15181 brings the claim under the 1983–84 policy, PE11970.

There is no evidence that PE11970 was extended past September 4, 1984.[10] Therefore the notice given on September 19, 1984 was too late to be deemed notice under PE11970.

■ Even if PE11970 were extended until PE15181 took effect, the notice is insufficient because it did not provide full information and is misleading.[11]

---

9. As stated *supra* at 64, question 30 states, in relevant part:

 SAMA has indicated that if any unauthorized change order resulting in increase in price can be attributable to design ... these may be backcharged to BDA Inc. This item has already been filed with Carrier.

10. The evidence does not support Plaintiffs' request for a findings of fact that the policy was extended until November 19, 1984.

11. The Court, however, does not deem the notice insufficient as a matter of law simply because it was given in a policy application. *See W.R. Grace & Co. v. Maryland Casualty Co.*, 33 Mass. App.Ct. 358, 600 N.E.2d 176, 182 (1992) (notice insufficient when buried in 57–page application among "wholly unrelated underwriting data"). Contrary to Defendants' assertions, *W.R. Grace* does not hold that notice given in a policy application is insufficient as a matter of law.

While condition XIII of the policy requires "immediate written advice" of "an incident or circumstance likely to give rise to a claim," condition I(a) requires "full information with respect to the time, place and circumstances of the event complained of." The application notice refers only to "unauthorized change orders." This is not full information, as it does not even mention to what the change orders relate.

 The notice is misleading, and did not give rise to a duty on the insurer to investigate the potential claim. Generally, good faith requires that an insurer notify an insured of deficiencies in notice within a reasonable time period. If the insurer fails to so notify, it waives its right to assert defective notice later. See *Federal. Sav. and Loan Ins. Corp. v. Burdette,* 718 F.Supp. 649, 654 (E.D.Tenn.1989); *See also W.R. Grace & Co. v. Maryland Casualty Co.,* 33 Mass.App. Ct. 358, 600 N.E.2d 176, 182–83 (1992). The notice states that the claim "has already been filed with Carrier." Testimony established that this meant that the item had been filed with the U.K. carrier. Defendants, however, reasonably could have believed that the unauthorized extras were part of one of two earlier noticed potential claims arising out of BDA's SAMA work. Defendants, therefore, were not required to notify BDA of the deficiency within a reasonable time period.

### 3. Inadequate notice of the HVAC claim

 Defendants contend that BDA's notice regarding the HVAC problem was inadequate. Although BDA noticed Shand in 1981, Defendants argue that the 1981 incident was not the same as the problem that arose in 1986. Defendants have failed to show that the problems are distinct. The Court is satisfied that the notice provided in 1981 covered the claim that arose in 1986.

### 4. Specific operations exclusion

 Defendants argue that the specific operations exclusion prevents Plaintiffs' recovery. As explained above, that exclusion barred only BDASA's supervision work from coverage. Further, because the electrical claims were not properly noticed, and because the mechanical claims were noticed prior to the effective date of the exclusion, this exclusion is inapplicable in this case.

### D. Damages

Defendants are liable to BDA for the amount of the HVAC claim. The total amount of fees and claims due and payable to all BDA entities is SR. 13,014,337.[12] Loss due to design negligence constitutes 72.14%, or SR. 9,388,542.70, of the total.[13] The loss due to the HVAC problem was 31.5% of the design negligence.[14] Therefore, Defendants are liable for SR. 2,957,390.90, or $788,367.57.

BDA noticed the HVAC claim to Northbrook under policy number 63133836 that provides $1 million coverage with a $25,000 deductible. Therefore, BDA is entitled to recover $763,367.57 from Northbrook.

### III. UNFAIR TRADE PRACTICES

 Count II of Plaintiffs' complaint asserts that Defendants violated Mass.Gen.L. ch. 93A §§ 2 and 11. To prevail in an action under chapter 93A §§ 2 and 11, a plaintiff must prove that a person who is engaged in trade or business committed an unfair or deceptive act, and that the plaintiff suffered a loss of money or property as a result. *Alan Corp. v. International Surplus Lines Ins. Co.,* 823 F.Supp. 33, 43 (D.Mass.1993).

 Chapter 93A does not define "unfair." Conduct that violates Mass.Gen.L. ch. 176D is evidence of unfairness under chapter 93A. *Alan Corp.,* 823 F.Supp. at 43–44 n. 4. Plaintiffs allege that Defendants violated chapter 176D §§ 3(9)(d) (it is unfair to refuse

---

12. The Court recognizes that this figure is lower than that listed in the zero-sum settlement. This is the sum that Comptroller Shapleigh figured in 1988, and it reflects partial payment by the SAMA.

13. The SAMA asserted claims totalling SR. 18,-212,401 against BDA in their 9215 letter. The

SAMA allocated SR 13,139,249, or 72.14%, to design claims.

14. Of the SR. 13,139,249 allocated to design claims, the SAMA allocated only SR. 4,139,249, or 31.5%, to the HVAC problem.

"to pay claims without conducting a reasonable investigation based upon all available information") and (f) (it is unfair to fail "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear"). While Defendants' conduct was inappropriate and at times heavy-handed, Plaintiffs did not establish that the Defendants failed to conduct a reasonable investigation. Further, initially, liability in this case was not reasonably clear.

Plaintiffs also allege that Defendants violated the judicially-promulgated definition of unfairness under chapter 93A. Under Massachusetts law, an alleged unfair trade practice is unfair if it is within " 'the penumbra of some common-law, statutory or other established concept of unfairness ... [or] is immoral, unethical, oppressive, or unscrupulous.' " *Farm Bureau Fed'n Inc. v. Blue Cross of Mass., Inc.,* 403 Mass. 722, 532 N.E.2d 660, 665 (1989) (quoting *Zayre Corp. v. Computer Sys. of America, Inc.,* 24 Mass. App.Ct. 559, 511 N.E.2d 23, 30 (1987). The Court is not persuaded that Defendants' conduct rose to the level of unfairness.

Judgment for Plaintiffs in the amount of $788,367.57 on Count I. Judgment for Defendants on Count II.

*SO ORDERED.*