**BROWN DALTAS & ASSOCIATES, INC., et al., Plaintiffs, Appellees,**

v.

**GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, et al., Defendant, Appellee,**

**Northbrook Excess & Surplus Insurance Co., Defendant, Appellant.**

No. 94–1576.

United States Court of Appeals, First Circuit.

Heard Dec. 9, 1994.

Decided Feb. 21, 1995.

31

Erik Lund, with whom Sibley P. Reppert, Jon C. Cowen, and Posternak, Blankstein & Lund, Boston, MA, were on brief, for appellant.

William Shields, with whom Day, Berry & Howard, Boston, MA, was on brief, for plaintiffs-appellees.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

This appeal arises out of an insurance coverage dispute between defendant-appellant Northbrook Excess & Surplus Insurance Company ("Northbrook"), and plaintiffs-appellees Brown Daltas & Associates, Inc. ("BDA"), Brown Daltas & Associates Saudi Arabia Ltd. ("BDASA"), Benjamin I. Brown, and Spero Daltas (collectively, "the insureds").[1] At issue is whether Northbrook must indemnify the insureds under the discovery clause of a $1,000,000 claims-made architects and engineers professional liability policy ("the Policy") covering the period May 5, 1981 through June 4, 1982. The Saudi Arabian Monetary Authority ("SAMA") made an underlying claim of architectural design negligence in April 1987; the insureds and the SAMA settled it in February 1990. After a jury-waived trial, the district court resolved the coverage dispute in favor of the insureds, entering judgment for them in the amount of $788,637.57.

Although Northbrook asserts that this ruling was infected by several deficient factual determinations, its flagship appellate argument is that the court clearly erred in finding that the insureds *first* became aware during the policy period of the circumstances subsequently giving rise to the SAMA's claim. Such awareness on the part of the insureds is one of the conditions precedent to coverage under the Policy's discovery clause—the only means by which coverage under the Policy was possible. After carefully reviewing the record and considering the parties' arguments on this question, we agree with Northbrook. Accordingly, we reverse.

## I.

The background of this litigation has been fully set forth in a published opinion by the district court. *See Brown Daltas & Assocs. Inc. v. General Acc. Ins. Co. of Am.*, 844 F.Supp. 58 (D.Mass.1994). The facts will be reiterated here only to the extent necessary to explain and resolve the dispositive issue—i.e., whether the insureds first became aware during the policy period of the circumstances subsequently giving rise to the SAMA's claim of design negligence.

### A. General Background

In 1974, BDA, which was then operating as a partnership, entered into a contract with the SAMA to design branch bank buildings in the Saudi cities of Riyadh, Jedda, Damman, Mecca, and Medinah. BDA completed the designs during the period 1974–1978. In 1978, BDA (which was by then incorporated) and Xenel, a Saudi company, formed BDASA as a joint venture. That same year, BDASA entered into a contract with the SAMA to administer and supervise the construction of the banks. In 1983, BDASA and the SAMA entered into a second supervision contract.

From 1979 through 1986, BDASA was insured for liability arising out of its *supervision* of the banks' construction under consulting engineer's indemnity policies issued by underwriters at Lloyd's of London. From 1978 through 1985, BDA and, at least in some cases, BDASA were insured for liability arising out of their *design* of the banks

1. Individual plaintiffs Brown and Daltas are architects and the founders of BDA. They also hold significant stakes in BDASA. Both were named insureds on the insurance policy at the heart of this litigation.

under professional liability policies issued consecutively by Lloyd's underwriters, Northbrook, the Evanston Insurance Company ("Evanston"), and the General Accident Insurance Company of America ("General Accident"). As we have stated, at issue here is a $1,000,000 Northbrook professional liability claims-made contract issued for the period May 5, 1981 through June 4, 1982. The underwriter of the Policy was Shand, Morahan & Company ("Shand").

Because of its "claims-made" nature, the Policy generally provided coverage only for claims first made against the insureds during the coverage period. An exception to this general rule was, however, set forth in the Policy's discovery clause. In relevant part, this clause provided:

> If during the policy period the Insured shall *first become aware of any circumstances which may subsequently give rise to a claim against the Insured* by reasons [sic] of any act, error or omission for which coverage would be afforded hereunder and if the Insured shall during the policy period herein give written notice to [Northbrook] of such circumstances, any claim which may subsequently be made against the Insured arising out of such act, error or omission shall be deemed for the purpose of this Policy to have been made during the policy period stated in the declarations.

(Emphasis supplied.)

Because the underlying claim here was not made by the SAMA until April 1987—nearly five years after the expiration of the Policy—coverage for the insureds depended upon operation of the discovery clause. And the discovery clause establishes as a condition precedent to its operation that the insureds *first* become aware during the policy period of the circumstances subsequently giving rise to any claim for which they might seek coverage.

Construction of the Riyadh and Damman branch banks began in late 1978 or early 1979. Construction at the other three sites began later. At some point between 1978 and 1981 (the evidence relating to exactly when will be set forth below), Laing Wimpey Alireza Ltd. ("LWA"), the contractor at the Riyadh, Damman, and Jedda sites, told BDA and BDASA that the heating, ventilation, and air conditioning ("HVAC") system was defectively designed. On November 25, 1981, following meetings with LWA in October 1981, BDA wrote to Shand and advised it of the possibility of a claim "in connection with the mechanical services in the building in Riyadh now nearing completion." In the first part of 1982, Shand wrote BDA and requested additional information. By letter dated June 30, 1982, BDA responded that (1) the potential claim was at the Riyadh branch; (2) the potential claimant was LWA; (3) "the areas of conflict surround the mechanical services, more particularly the heating, ventilation and air conditioning (HVAC) system"; and (4) "[i]t is important to understand that the Riyadh and Damma[n] Branches are identical designs."

Meanwhile, on April 6, 1982, BDASA also gave written notice to its Lloyd's underwriters of the possibility of a claim involving the air conditioning system. The April 6, 1982 notice did not specify the Riyadh plant as the site of the potential claim; nor did it explain how the claim might be covered under BDASA's supervision policy. It did, however, state that LWA was the potential claimant. Moreover, it listed "October 1981" as "the date on which [BDASA] first became aware of circumstances which may give rise to a claim being made against [it]." This date corresponds to the following assertions, which were included in a statement attached to the circumstances/claim notification form:

1. [BDASA] was informed by [LWA] in May 1981 that there were certain problems in commissioning the airconditioning [sic] plant.

2. BDASA convened a meeting in Riyadh in June 1981 together with [LWA] and the representative of York International the equipment supplier, with the design mechanical engineer and the Rome project manager also present.

3. The next meeting was on 21 October 1981, when [LWA] said that he [sic] was not responsible, but had only to install the specified equipment. We replied that it was their responsibility to install a workable system. At this

point we became aware that there was a possibility of a claim being made.

Although the controversy involving the banks' HVAC systems never completely subsided, no claim was made against BDA or BDASA for the next several years. In the interim, several attempts were made to commission the air conditioning systems at several of the banks. For a variety of reasons, none enjoyed sustained success. During this same period, BDA and BDASA periodically submitted to the SAMA requests for the payment of fees (monthly payments on design work) and claims (extra costs that arose during design) owed for their work. The SAMA was not very responsive to these requests.

Finally, in November 1986, BDA and BDASA completed their design and supervision work, and requested financial resolution meetings with the SAMA. Contemporaneously, BDA issued a comprehensive report documenting SR 13,192,337 [2] in unpaid fees and claims. On April 7, 1987, the SAMA responded to this report with a letter stating its intention to make claims of its own against BDA and BDASA in the amounts of SR 9,000,000 for negligence in the design of the electrical systems; SR 4,139,249 for negligence in the design of the HVAC systems; and over SR 5,000,000 for other errors (including supervision errors). The letter also stated that the SAMA was willing "to renounce all claims against BDA in return for a zero settlement of your final account." Although it took several years to consummate, the parties eventually entered into a zero-sum settlement in February 1990. The settlement was reached without either party initiating an adversarial proceeding.

### B. Proceedings Below

Subsequent to their zero-sum settlement with the SAMA, the insureds sought indemnification from several of their insurers. Because the insureds could not obtain the relevant insurance at the time the SAMA's claim actually was made, coverage depended upon operation of discovery clauses in various of the insurance contracts. The insureds were able to obtain a $600,000 recovery from

Lloyd's for that portion of the settlement attributable to supervision claims; the design insurers, however, contested coverage. The insureds therefore initiated the instant action.

In their complaint, the insureds alleged that Northbrook's failure to provide indemnification (up to the Policy's limit) for that portion of the settlement attributable to negligence in the design of the HVAC systems constituted a breach of contract and a violation of Massachusetts' unfair trade practices statute. *See* Mass.Gen.L. ch. 93A, §§ 2 and 11 (1993). The same allegations were made with regard to General Accident's failure to provide indemnification for that portion of the settlement attributable to negligence in the design of the banks' electrical systems. After a four-day bench trial, the court ruled in favor of the insurers on the Ch. 93A claims, and also ruled that the insureds' breach of contract claim against General Accident failed because of inadequate notice. *See Brown Daltas,* 844 F.Supp. at 66–68. None of these rulings is challenged on appeal.

The court also ruled that Northbrook had breached the Policy in failing to indemnify the insureds under the Policy for their settlement of the SAMA's claim of negligence in the design of the HVAC systems. *Id.* at 67. In so doing, the court found BDA's November 25, 1981 letter to Shand sufficient to invoke coverage under the Policy's discovery clause. *See id.* Of critical importance, the court rejected Northbrook's assertion that the insureds had notice *prior* to the policy period of the circumstances subsequently giving rise to the SAMA's HVAC claim. *Id.* at 62 n. 3. The court's finding on this issue reads:

> Defendants maintain that LWA noticed [the HVAC] problem to BDASA in 1979. They cite a July 19, 1981 letter from LWA to BDASA that states:
>
>> This company has no design obligations. The error within your specification was pointed out in 1979 and at no time were revised on/off coil conditions placed with us. We would confirm your designers

---

2. The applicable exchange rate between the Saudi Riyadh and the dollar is SR 3.75 per $1.00.

[sic] own words at the recent meetings where he stated that a "mistake was made."

This letter reference alone is insufficient to prove that BDA or BDASA had notice in 1979.

*Id.*

## C. Evidence Relating to the Insureds' "Notice of Circumstances"

Although the portion of the July 19, 1981 letter from LWA to BDASA quoted by the district court is certainly relevant to the notice question, it is not the only part of the letter that pertains to the issue. Moreover, there is significant other evidence—including the April 6, 1982 notice of circumstances from BDASA to Lloyd's, *see supra* at 32–33—relating to notice in this record. Because this is the basis upon which we resolve the dispute, we believe it important to relate the evidence in some detail.

### 1. The July 19, 1981 Letter

In addition to the passage cited by the district court, the lengthy July 19, 1981 letter from LWA (the contractor) to BDASA contains several other passages which at least suggest that the conflict over alleged negligence in the design of the HVAC systems predated May 5, 1981—the effective date of the Policy. The letter is a point-by-point response to nine assertions made to LWA by BDASA in a July 6, 1981 letter that is not in evidence; understanding it therefore is not particularly easy.

In paragraph one, LWA details a series of undated "recent meetings" between LWA and BDASA. The paragraph then states: "This recent meeting [sic], we were advised, was to finally agree [sic] the solutions to your long outstanding problems." Similarly, paragraph six asserts:

Please advise on what basis your [sixth point in the July 6, 1981 letter] to be correct. Condensing Unit No. 5 was clearly specified by yourselves. The machine on site was approved by yourselves and we confirm that the compressor is larger than standard for this package.

The possibilities of the problems actually experienced on site were raised by us in late 1978. We have on file your telexed reply dated 12 October 1978 which refutes our concern and effectively advises us to proceed without concern.

We categorically refute any allegation of responsibility in this matter.

Finally, after responding to the ninth and final point in the July 6, 1981 letter, LWA states:

We fail to see how this company having brought to your attention these problems as early as 1978 and continually throughout the contract and having demonstrated the problems and offered workable solutions, can be of more help.

Your apparent wish to ignore, reject and refute our assistance continually is the major factor with regard to the total situation and all consequent delays.

We must insist that the financial consequences and liabilities are resolved prior to the placement of any orders.

### 2. Testimonial Evidence

In addition to the July 19, 1981 letter, evidence pertaining to plaintiffs' notice of circumstances came in through the testimony of Benjamin I. Brown, a principal of BDA and plaintiffs' most significant witness. Mr. Brown touched on the notice issue three times during the course of his extensive testimony.

Mr. Brown first gave testimony relating to this issue on direct examination:

Q (By [Plaintiffs' Counsel]): Mr. Brown, in the insurance policies we looked at there was notification to [Shand] of a potential claim or incident under the name of [LWA], can you tell us what that was all about[?]

A During the first year-and-a-half, two years, the contractor for the Riyadh branch named [LWA] brought it to the attention of the client and ourselves that their view of the HVAC system indicated that it would not function satisfactorily.

And they said that on account of this, they could foresee that there would be additional costs to make revisions and corrections in the equipment before they

could guarantee that the equipment would function properly.

In Saudi Arabia the contractors are rather like in Europe are responsible [sic] for producing a workable project, consultants don't have quite as much leeway there as they do here. So they would hold the contractors [sic] feet to the fire before they would ours.

Q. Now, Mr. Brown, are you sure that they were '78 or '71 [sic]?

[DEFENDANTS' COUNSEL]: Objection.

THE WITNESS: I am not—I am sure it was—it wasn't.

THE COURT: Just a moment, please.

THE WITNESS: I don't think I said—

THE COURT: Just a moment. Mr. Brown, when you hear an objection if you just sort of pause and give me a chance to address it.

[DEFENDANTS' COUNSEL]: I think it's a key factual issue here, and he is trying to lead the witness in my opinion.

THE COURT: Well, what I am interested in is what is indeed the fact. I will overrule the objection.

THE WITNESS: I am not sure I said '78 when LWA discovered it, it was several months, maybe a year-and-a-half or two after construction started in '78 when we received the first very serious criticism of the HVAC system from a reputable contractor who [sic] we had to investigate very seriously.

The question of notice was extensively revisited during Mr. Brown's cross-examination:

Q. (By [Defendants' Counsel]): I would like to move to the HVAC claim.

The notification as to that claim I believe you testified was in 1981, to Northbrook, is that right?

A. As I recall, yes.

Q. Now, the problem that gave rise to the notification was low suction pressure; is that correct?

A. Your memory is better than mine.

THE COURT: Are we talking now about the claim with regard to Riyadh or the claim in general?

[DEFENDANTS' COUNSEL]: Yes [sic]. This is the notification that was given in 1981 regarding the HVAC in Riyadh. I am going to show you [the July 19, 1981 letter from LWA to BDASA].... It appears to be a letter from [LWA] to [BDA-SA].

A. I am sure the letter is authentic. I don't recall it specifically, but it looks—

Q. [LWA] was the contractor from whom the notification of potential claim came, right?

A. Yes, and Mr. Wilson was the project manager on the site at that time as the signer of the letter.

After taking Mr. Brown through several of the specific problems alluded to in the July 19, 1981 letter, defendants' counsel continued his cross-examination:

Q. Now, isn't it correct to say that [LWA] criticized the design back as early as 1978?

A. Certainly before this letter in '81.

Q. First reference to the timing of their criticisms of the design is on the first page, as I see it, the last, the second paragraph, the paragraph indicating No. 2 on the first page where it states, "The company, this company has no design obligations. The error within your specification"—

A. Sorry, I've lost you.

Q. If you look at the first page of the document, sir, down at the bottom.

A. Okay.

Q. The second numbered paragraph, it states, "This company has no design obligations. The error within your specification was pointed out in 1979, and at no time were revised on/off coil conditions placed with us."

Do you see that?

A. Yes, I do.

Q. And isn't it correct to say that [LWA] did notify the company about its objections about the design back in 1979?

A. That's correct.

Q. And the—on Page 3 under numbered Paragraph 6, there is a paragraph that says, "The possibilities of the problems actually experienced on site were raised by us in late 1978. We have on file your telex

reply dated 12 October 1978 which refutes our concern, and effectively advises us to proceed without concern."

Do you see that?

A. Yes.

Q. And do you have knowledge regarding that telex?

A. I don't recall that incident.

Q. Do you have any reason to believe that there was no such telex—

A. No.

Q. —Back in 1978 from your company?

A. I am sure if he said it in writing it occurred.

Q. So it's fair to say that the problems asserted by LWA, regarding the air conditioning were asserted back in '78 to '79 time period?

A. Yes.

The notice question arose again on redirect examination:

Q. (By [plaintiffs' counsel]): [Defendants' counsel] raised with you Exhibit 105, Mr. Brown. This was a letter from [LWA], dated 19 July 1981. Do you recall talking with him about that?

A. Yes, I do.

Q. All right. In October, in October 1981, do you recall attending a meeting with [LWA] or anybody on your staff?

A. I am sure I did not. I couldn't swear to the exact dates of meetings, but [LWA] had, had many questions about the design from the beginning which we had been able to satisfy until, I suppose it's the letter that was the—that they sent to the SAMA where they said we believe, we, [LWA], believed that it, that the corrections to the system will cost so many millions of rials [sic] for this that and the other, and the cost implications made us begin to worry about it that it may be a serious problem if they are—

Q. Did you notify your insurance carrier when that happened?

A. I'm sure that's the point at which we asked on our notification.

## II.

In reviewing a factual finding of a trial court made in connection with a bench trial, we almost invariably apply the clear-error standard of review. *See* Fed.R.Civ.P. 52(a). Thus, we must give the finding effect unless we are " 'left with the definite and firm conviction that a mistake has been committed.' " *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948)); *accord Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 457 (1st Cir.1992). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511.

■ If, however, an appellant can demonstrate that the trial court based its finding upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard. *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982); *accord Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 153 (1st Cir.1990) ("It is settled that one way around the rigors of the 'clearly erroneous' rule is to show that the trial court mistook the applicable law." (Citations omitted.)). "[T]o the extent that findings of fact can be shown to have been predicated upon, or induced by, errors of law, they will be accorded diminished respect on appeal." *Dedham Water*, 972 F.2d at 457.

The parties have treated Massachusetts law as controlling in this dispute. Because there is at least a "reasonable relation" between this litigation and the forum whose law has been selected (plaintiffs BDA and Mr. Brown were citizens of Massachusetts at all relevant times), we shall forego an independent choice-of-law inquiry and look to Massachusetts law for our rules of decision. *See Bird v. Centennial Ins. Co.*, 11 F.3d 228, 231 n. 5 (1st Cir.1993). Thus, in deciding whether legal error infected the crucial finding, we will be guided by Massachusetts law.

## III.

■ Here, we think it clear that the trial court's finding regarding when the insureds first had notice of circumstances subsequently giving rise to the SAMA's claim was predicated upon an error of law. Northbrook makes much of the fact that, in making its finding, the court seems to have relied upon only the paragraph of the July 19, 1981 letter discussing the defectively designed on/off coil conditions. *See Brown Daltas,* 844 F.Supp. at 62 n. 3 (setting forth the paragraph at issue and finding that "[t]his letter reference *alone* is insufficient to prove that BDA or BDASA had notice in 1979") (emphasis added). While it is unfortunate that the court failed to mention the balance of the evidence on this issue, we think that another serious error lurks in the challenged finding: an erroneous shift to Northbrook of the burden of proof. And although the parties have largely skirted burden questions throughout this litigation, we think that proper resolution of the burden of proof question effectively disposes of this appeal.[3]

Although we cannot find a Massachusetts case which discusses the burden of proof in a discovery clause issue like the one here, a general principle of Massachusetts insurance law settles the question:

"[A] plaintiff seeking to recover for breach of a duty or obligation created by a general clause of a contract, which also contains an exception descriptively limiting such duty or obligation, must allege and prove that his cause of action is within the contract and outside the exception; but ... where the exception is in another separate and distinct clause of the contract defining the duty or obligation, then the burden is upon the party relying upon the exception."

*Ratner v. Canadian Universal Ins. Co.,* 359 Mass. 375, 269 N.E.2d 227, 230 (1971) (quoting *Murray v. Continental Ins. Co.,* 313 Mass. 557, 48 N.E.2d 145, 147 (1943)). In this case, the coverage-limiting provision upon which Northbrook relies is *not* set forth as a distinct exclusion in the Policy; it is the first sentence of the coverage-providing clause (i.e., the discovery clause) upon which the insureds' claims are anchored. It therefore was incumbent upon the insureds to prove the non-applicability of the coverage-limiting provision found in the first sentence of the discovery clause. Put in concrete terms, it was the insureds' burden to prove that they *first* became aware during the policy period of the circumstances subsequently giving rise to the SAMA's claim that the HVAC systems were negligently designed.

As we have stated, the trial court found that the quoted portion of the July 19, 1981 letter was "insufficient to prove that BDA or BDASA had notice in 1979." *See Brown Daltas,* 844 F.Supp. at 63 n. 3. Implicit in this statement was an erroneous view that *Northbrook* bore the burden of proving prior notice. Thus, the deference usually due a factual finding under Fed.R.Civ.P. 52(a) does not bind us in this instance. *See Inwood Labs.,* 456 U.S. at 855 n. 15, 102 S.Ct. at 2189 n. 15.

■ Mindful of our limited role as an appellate court, we ordinarily would remand this matter to the district court for a determination of the notice question under the proper legal standard. On this record, however, such a remand would be an empty exercise; no rational factfinder could find that the insureds proved that they first had

---

**3.** Although Northbrook has not specifically argued that an erroneous shift in the burden of proof was implicit in the court's notice of circumstances finding, it can in no way be seen as having conceded that the burden was its own. In its appellate briefs and throughout the course of this case, Northbrook has treated the burden of proving coverage as being properly placed upon the insureds. The insureds never disputed this position. Moreover, at oral argument, counsel for the insureds acknowledged that the insureds bore the burden of proof on another issue—the question whether the November 25, 1981 letter from BDA to Shand constituted ade-· quate notice under the Policy's discovery clause—analytically analogous to the instant question. Thus, we discern no procedural bar to our analyzing the correctness of the trial court's finding through the lens of the burden of proof. *Contrast Dedham Water,* 972 F.2d at 458–59 (party's acquiescence in the application of a rule of law in the trial court precludes it from subsequently challenging the rule); *Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247–48 (1st Cir.) (party's failure to object below to magistrate judge's choice-of-law ruling barred appeals court challenge to the ruling), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985).

notice during the policy period of the circumstances subsequently giving rise to the SAMA's claim. Accordingly, we will resolve the issue ourselves. *See Williams v. Poulos,* 11 F.3d 271, 280–81 (1st Cir.1993) (discussing situations where an appellate court may decline to remand for resolution of factual and mixed fact/law issues) (collecting cases).

As an initial matter, there is a dispute as to the standpoint we should assume in deciding the notice of circumstances question. Citing cases that apply Illinois law, Northbrook asserts that the question should be viewed from an objective perspective, and that we need decide whether, prior to the policy period, the insureds knew of circumstances that *should* have put them on notice of the possibility of a claim. The insureds, however, treat the issue as a subjective one, essentially arguing that the question simply is whether, prior to the policy period, they were "aware of circumstances which [*they*] *believed* might give rise to a claim in the future." We need not resolve the dispute in this case.

■ Even if we assume *arguendo* that the question of notice should be viewed from a subjective perspective, the insureds still must show that they first became aware during the policy period of the circumstances that *did* lead them to notify Northbrook of the possibility of a claim. In other words, the relevant point in time under the terms of the Policy is not the point at which the insureds first came to believe that a claim was possible; it is the point at which they first became aware of the *circumstances* which in fact led them to file their notice of potential claim. The distinction is critical in this case, because plaintiffs have not established that they first became aware during the policy period of the circumstances which led to their November 25, 1981 letter to Northbrook.

Northbrook takes the position that LWA's criticism of the design of the HVAC systems constitutes the notice-triggering "circumstance" under the Policy. The insureds, however, have not made entirely clear their stance on this crucial question. On redirect examination, Mr. Brown testified that the notice-triggering circumstance was a letter that the contractor (LWA) sent to the SAMA which allegedly stated "we believe, we,

[LWA], believed that it, that the corrections to the [HVAC] system will cost so many millions of rials [sic] for this that and the other." *See supra* at 36. This, of course, conflicts with the April 6, 1982 notice from BDASA to Lloyd's, which states that the notice-triggering circumstances occurred at an October 21, 1981 meeting in Riyadh. *See supra* at 32–33. It also conflicts with the insureds' brief, which contends that the notice-triggering circumstances were "the meetings in the summer of 1981 [between representatives of BDA, BDASA, LWA, and the HVAC equipment supplier], followed by the October meeting in London and LWA's claim to SAMA." Regardless, close scrutiny of the record reveals that none of the insureds' theories vindicates their baseline position.

Mr. Brown's assertion that a letter from LWA to the SAMA was the notice-triggering circumstance simply cannot support a finding that the insureds first became aware of the notice-triggering circumstances during the policy period. The letter to which Mr. Brown alludes is not part of the record, and we have no evidence that it was sent during the policy period. Even more fundamentally, we have no elaboration from the insureds as to how this letter altered the then-existing landscape in such a way that, after it was sent, the insureds *first* believed that a claim against them was possible. One might infer from Mr. Brown's testimony that this letter was the first time LWA attached a cost to the design errors, and that *this* was the notice-triggering circumstance; the insureds, however, have made absolutely no argument to this effect.

The insureds' contention that the meetings in the summer and fall of 1981 constitute notice-triggering circumstances is similarly flawed. The insureds do not say much about what occurred at those meetings, let alone explain how the communications at those meetings were so qualitatively different from prior communications between themselves and LWA that it led them, for the first time, to believe that a claim was possible. And the scant record evidence of what occurred at those meetings reveals nothing beyond LWA informing BDA and BDASA of its view that the HVAC system was, at least in some respects, incorrectly designed. Essentially

unrebutted, then, is Northbrook's argument that LWA's assertion of this view was the notice-triggering circumstance.[4] Therefore, the question really boils down to whether a reasonable factfinder could find that the insureds proved by a preponderance of the evidence that LWA's view was *first* expressed during the policy period. No such finding is possible on the record before us.

We need not reiterate all the evidence regarding when LWA first criticized (or seriously criticized, *see supra* note 4) the design of the HVAC systems. It is sufficient to state that there is significant record evidence indicating that such criticism predated the policy period. This evidence includes the July 19, 1981 letter's indications that problems with the design of the on/off coils had been pointed out in 1979, and that problems with the design of Condensing Unit No. 5 had been pointed in 1978. It also includes: (1) Mr. Brown's direct testimony that LWA had informed the insureds' of its view that the HVAC system "would not function satisfactorily" within a year-and-a-half or two years of construction beginning (in late 1978 or early 1979); (2) Mr. Brown's direct testimony that LWA had seriously criticized the design of the HVAC systems within two years of construction beginning; and (3) Mr. Brown's concession on cross-examination that the problems asserted by LWA regarding the air conditioning had been asserted back in 1978–79. To the extent that the insureds wish us to construe this testimony as involving careless guesswork on the part of Mr. Brown, we note that no attempt at clarification was made on redirect examination.

On the other hand, there is a total absence of evidence tending to indicate that LWA's criticism of the HVAC system's design first occurred during the policy period. Because such criticism was apparently the "circumstance" that prompted the insureds to notify Northbrook of the possibility of a claim of design negligence, and because the insureds bore the burden of proving that they *first*

became aware during the policy period of the circumstances subsequently giving rise to the SAMA's claim, this ends the matter. Judgment should have been entered in favor of Northbrook.

**IV.**

For the reasons stated above, the district court's finding in favor of the insureds on the question of notice is premised upon an incorrect view of the burden of proof and is not sustainable. Moreover, while we agree completely that generalized criticisms of shortcomings in a party's product or performance will ordinarily be insufficient, without more, to serve as a notice-triggering circumstance for purposes of claims-made coverage, this is not the garden-variety case. Here, the insureds' lack of proof is a determining factor. In short, our reading of the record in the light of the proper burden of proof leads us to conclude that judgment should properly enter in favor of Northbrook. The district court's contrary judgment is therefore reversed.

*Reversed. Costs to appellant.*

---

4. In stating in their brief that "[g]eneralized criticisms of the design by a contractor, far from being unusual in any construction setting, are simply not events which require a designer to put his carrier on notice," the insureds may be implying that no sufficiently serious or specific design criticisms were lodged against them by LWA prior to the policy period. Without further explication (including a statement as to where and when the criticisms became sufficiently serious and specific) and supporting record evidence, however, such an implication is inadequate.